## LLOYD v. RAWL.

1. NEW TRIAL—JUROR.—In absence of motion to adjourn or other kind, because of lack of attention of juror on account of physical condition, to which Judge's attention was called, it is not error to refuse to grant a new trial on ground of juror's condition.

2. HEIR AT LAW—INTESTATE ESTATES—SLAVE CHILD—EX POST FACTO LAW.—THE COLORED CHILD of a slave mother born to a white man in concubinage, is an heir at law of its maternal grand-mother, when its mother predeceased her, and the status devolved by the act of 1865 on colored children born prior to emancipation, cannot be divested by the repeal of that act.

3. LIMITATION OF ACTIONS—PLEADINGS—ADVERSE POSSESSION.—A defendant in an action for possession of land, under general denial, may show that he or some one not a party to the record has been in adverse possession for the statutory period; but if he pleads the statute, and claims title thereby in himself, he must show that *he* has held the land for the full period.

4. CHARGE not commenting on the testimony in general or that of any particular witness, is not a charge on the facts.

5. ADVERSE POSSESSION—CHARGE.—When two persons live pleasantly together on a tract of land to which one has title, the possession of one is not adverse to that of the grantee, and the illustration of this proposition by reference to man and wife cannot be construed to mean an instruction that the parties here sustained that relation to each other.

Before GAGE, J., Richland, April term, 1901. Affirmed.

Action by Marie I. Lloyd and James H. Root against Frances E. Rawl *et al.,* executors of Simeon Rawl. From judgment for plaintiff, defendants appeal.

*Mr. Andrew Crawford,* for appellants, cites: *As to the repeal of the enabling acts, and their non-applicability to this case:* Suth. on Stat. Con., secs. 137, 138; 54 S. C., 255; 56 S. C., 173, 400; 61 S. C., 411; 15 Stat., 183; 33 S. C., 81. *As to holding the land adversely to the concubine while both are living on the land:* 1 Ency., 820. *As to the motion for new trial because of condition of one juror:* Thompson and Merriam on Juries, sec. 428; 55 S. C., 90; 22 W. Va., 44; 70 Wis., 562; 79 N. W., 337; 13 S. C., 461; 26 S. C., 128; 1 N. Y. Law. Rec., 157; 48 N. E., 238; 36 Ga., 459; 13 Conn., 459; 15 Nev., 163; 139 Mass., 43; 61 Minn., 467; 12 Neb., 5; 17 N. W., 881; 12 Kan., 539; 12 Ency. P. & P., 628. *As to adverse possession and statutes governing the same:* 53 S. C., 126; 50 S. C., 297; 48 S. C., 45.

*Messrs. Thos. F. Brantley, Henry F. Jennings* and *Wm. H. Lyles,* contra. *Messrs. Brantley and Lyles* cite: *As to the right of an illegitimate colored child, born prior to December, 1865, to inherit from its mother or grand-mother:* 15 Stat., 183; 10 S. C., 337; 61 S. C., 411; 32 S. C., 67; 41 S. C., 461. *He who pleads the statute of limitations must show possession for full period:* 59 S. C., 449; 35 S. C., 610; 39 S. C., 19; 45 S. C., 316; 50 S. C., 297, 457. *The possession must be adverse and notorious:* 61 S. C., 288; 23 S. C.,

351; 121 N. C., 268; 2 Bail., 605; 167 U. S., 529; 168 U. S., 66; 35 S. C., 610; 4 How., 295; 26 S. C., 247; Code, 101. *Stating the claims of a party, is not charging on the facts:* 55 S. C., 32. *As to the refusal of new trial because of the condition of a juror:* 9 Rich., 480; 6 S. C., 177, 344; Thompson and Merriam on Juries, sec. 428; 55 S. C., 90; 32 W. Va., 44; 70 Wis., 462; 79 N. W., 337; 1 N. Y. Law Rec., 157; 48 N. E., 238; 36 Ga., 345; 13 Conn., 459; 15 Nev., 163; 139 Mass., 43; 34 Conn., 294.

March 27, 1902. The opinion of the Court was delivered by

MR. JUSTICE POPE. This action was commenced 1st March, in the year 1899, for the purpose of recovering 150 acres of land, and for the sum of $1,500, the value of the use and occupation thereof by the defendants, and for costs. The defendants denied the facts set out in the complaint, and as a second defense interposed the statute of limitations (a) for ten years and (b) for twenty years. It came on for trial before his Honor, Judge Gage, and a jury. The verdict was in favor of the plaintiffs for one-half of the 150 acres of land sued for, and also for the sum of $395.50 for rents. A motion was made for a new trial: *first,* on the minutes of the Court, and *second,* on the ground that E. S. Parker, one of the jurors, was under the influence of opiates or alcoholic drink to so great an extent that such juror could not properly discharge the duties of his office as said juror. The motion was denied on both grounds. And now the defendants appeal from the refusal of the motion for a new trial on the ground of the improper condition of the juror, E. S. Parker, and also upon the ground of certain alleged errors in the charge of the Circuit Judge to the jury.

We will *first* pass upon the alleged error, in refusal to grant a new trial because of the condition of the juror, E. S. Parker. The "Case" contains the affidavit of W. H. Coleman, Esq., as sheriff, G. Flavie Cooper, J. A. Black and Andrew Crawford, Esq., on one side; and of E. S. Parker

and William H. Lyles, Esq., on the other side. It seems from the affidavits, that during the examination of the witnesses for the defense and just before such examination was concluded, Mr. Crawford, in the presence of Mr. Lyles, called the attention of the presiding Judge to the attitude of the juror, E. S. Parker, wherein it appeared that the juror had his head leaning down as if he was under the influence of some opiate or whiskey, which indicated that he was not caring for the testimony offered— indeed, as if asleep; that one or more of the jurors used some efforts to keep the juror's attention. The juror admits that he had been unwell and had taken some whiskey, but he claims to have heard and considered all the testimony which was offered for the defense. No motion was made by either of the counsel either to adjourn the hearing or any other. That this juror was discharged from any other attendance upon the Court, after verdict rendered. It seems to us that if the defendants' attorney had wished the Court to take affirmative action, he should have made some motion addressed to the Court. Not having done so, and as the Circuit Judge did not care, under the circumstances, to make any order for a recess or adjournment, in view of the fact that it was late in the afternoon of the second day of the trial and it then being, at furthest, only an hour to adjournment of the Court for the day, we will not interfere on either of the grounds submitted in this particular.

The main contention presented by the exceptions of the appellants is that relating to the charge of the Circuit Judge, wherein he held that a child born of a colored mother, who was a slave before the 21st day of December, 1865, although the father of said child was a white man, could inherit through said colored mother after her death of a grandmother who was a slave up to her emancipation. But it will be more satisfactory to let these exceptions speak for themselves. Therefore, we reproduce the text of these exceptions along with the remainder thereof:

"1. For that his Honor erred in charging, as requested by

plaintiffs in their first request to charge, as follows: 'That, by the statutes of the State of South Carolina, all colored children, born prior to the act of December 21, 1865, are made legitimate children of their colored mother, and are capable of inheriting from such mother, or grand-mother through the colored mother, just as if they were born in lawful wedlock.' Thereby giving the jury to understand that all colored children born prior to said act are by said act made the legitimate children of their colored mother, even though born in concubinage or the children of a white father, or both, and that such children would be entitled to inherit through a colored mother from a colored grand-mother, although the latter died after the act of March 12, 1872 (15 St., 183).. Whereas, his Honor should have held and charged that colored children born prior to said act of 1865 are the legitimate children of their colored mother only where they have a colored father, and only where they are the offspring of a moral marriage; and whereas, his Honor ought to have held and charged that, after the repeal of the said act of 1865 by Rev. Stat. 1872, and the passage of said act of March 12, 1872, the said act of 1865 no longer applied to cases where such children claimed to inherit from a colored mother or grand-mother dying after said act of March 12, 1872.

"2. For that his Honor erred in charging, as requested by plaintiffs in their fourth request to charge, as follows: 'That one who pleads the statute of limitations is bound to make out, by a preponderance of the testimony, that his possession of the property was adverse to the title of the party who rightfully owned the same, and must show that the possession has continued in himself for the full statutory period.' Thereby giving the jury to understand that where, in an action to recover real estate, defendant pleads the statute of limitations, and claims title in himself by adverse possession, it is incumbent on the defendant, in order to make out his defense, to prove affirmatively the adverse character of his possession, and to prove such possession in himself for

the full statutory period; whereas, he should have held and charged: (1) That, in such a case, it is enough for defendant to prove the fact of possession, and that possession being proved, it will be presumed to have been of an adverse character until the contrary is made to appear. (2) That, in such a case, it is sufficient for defendant to prove such possession in himself, or in any other person under whom he claims.

"3. For that his Honor erred in charging the jury, as requested in plaintiffs' sixteenth request to charge, as follows: 'That the effect of the decree in the case of Josephine Moore against Jane Myers and others, the heirs at law of Baron DeKalb Myers, was to establish as against all persons who were parties to that cause; that neither the said DeKalb Myers, nor any person claiming under or through him, and parties to that cause, had any right or title to the tract of land described therein as the Bynum place.' Thereby giving the jury to understand that the decree in said case of Moore *v.* Myers *et al.,* as to the matters and things therein adjudged, was conclusive not only in favor of the parties thereto and their privies, but also in favor of other persons being neither parties thereto nor their privies. Whereas, his Honor should have held and charged that said decree was conclusive as between the. parties thereto and their privies only.

"4. For that his Honor erred in charging the jury, as requested in plaintiffs' eighteenth request to charge, as follows: 'That if the jury believe, from the preponderance of the evidence, that Norville Barclay was the daughter of Jane McMillan, and that she was a colored woman, and that James H. Root and Marie Lloyd are the children of Norville Barclay, and that either of them was born prior to the 21st of December, 1865, they should find for the plaintiffs, or. the one born before December 21, 1865, one-half of the land in dispute.' Thereby giving the jury to understand that the only issues for their consideration were the issues of relationship, color and birth therein indicated; and thereby ex-

cluding from the consideration of the jury all the other
issues of fact raised by the pleadings, and, in effect, himself
deciding such other issues against the defendants, and
charging the jury in respect to matters of fact.

"5. For that his Honor erred in charging the jury that if
Jane McMillan 'had colored children or grand-children,
born before the 21st of December, 1865, then her title de-
scended to those children or grand-children;' whereas, he
should have held and charged that such would be the case
only where such children or grand-children were born in
lawful wedlock, or were the offspring of a moral marriage.

"6. For that his Honor erred in charging the jury as fol-
lows: 'I charge you if she (Jane McMillan) has a deed, and
if she had colored children or grand-children, born before
the 21st of December, 1865, then her title descended to those
children or grand-children. Then what is the issue for you?
The issue for you is, are the plaintiffs, James Root and
Marie Lloyd, the colored grand-children of Jane McMillan,
or more specifically, was Norville Barclay the colored child
of Jane McMillan? Are these plaintiffs the colored chil-
dren of Norville Barclay, born before December, 1865? If
so, I charge you then that Jane McMillan's title descended.
one-half of it to these plaintiffs. If the questions of fact
which I have submitted are true, then the plaintiffs have the
legal title to one-half of the land in dispute.' Thereby giv-
ing the jury to understand that if Jane McMillan had a deed
to the land in dispute, and if Norville Barclay was her col-
ored child, and if the plaintiffs were the colored children of
Norville Barclay, and born before December, 1865, then the
plaintiffs had the legal title to one-half of the land in dispute,
thereby excluding from the consideration of the jury all the
other issues of fact raised by the pleadings, and, in effect,
himself deciding such other issues against the defendants,
and in this way charging the jury in respect to matters of
fact; whereas, his Honor should have confined himself to a
declaration of the law applicable, and should have submitted
to the jury the following issues raised by the pleadings,

15—63

namely: (1) The issue of title in plaintiffs or in Jane Mc-Millan, under whom they claimed, raised by the first defense of the answer. (2) The issue whether defendants were in possession, raised by the first defense of the answer. (3) The issue of adverse possession, raised by the second defense of the answer.

"7. For that his Honor erred in charging the jury as follows: 'If you conclude it (the statute of limitations) is not made out in them, then your next inquiry is, is it made out in the person under whom they claim, to wit: Baron De-Kalb Myers.' Thereby giving the jury to understand that defendants claimed under Baron DeKalb Myers, and in this way charging the jury in respect to matters of fact.

"8. For that his Honor erred in charging the jury as follows: 'I charge you, gentlemen, that if a man and his wife are on land and the legal title is in the wife, and they hold possession together, occupy it together, if that state of facts exist, the statute would not begin to run in favor of the husband against the wife. In order to make out the statute, the possession must be exclusive, it must be continuous, it must be adverse, must be for the full statutory period. Now, I will leave it to the jury to say whether or not these people were there together, and whether or not they were holding it together.' Thereby giving the jury to understand that the same inferences as to whether a possession is adverse or permissive are to be drawn from the possession and control of land by a married man, whose wife is living, where the legal title is in his concubine who is living with him on the land, as are to be drawn from his possession and control of the land, when the legal title is in his wife who is living with him on the land. This, if stated as a proposition of law, is error. If stated as a matter of fact, then his Honor erred in charging in respect to facts.

"9. For that his Honor erred in refusing the motion for a new trial, as follows: (a) His Honor erred in not deciding the issue of fact as to the condition of the juror, E. S. Parker, made by the affidavits submitted on such motion.

(b) It appearing by the overwhelming weight of the evidence submitted that the said juror, while sitting on the jury during the trial of the case, and while the witnesses for the defense were being examined, was in such a condition of stupor or condition of disability as to be unable intelligently to consider the testimony that was being delivered; and this condition of the juror having been brought by defendants' attorney to the attention of the presiding Judge without any action being taken by the presiding Judge, under these circumstances his Honor erred in refusing the motion for a new trial."

It is always well in discussing a charge of the Judge to see exactly what he did say in its entirety. Here we will reproduce his charge:

"Gentlemen of the jury: This is an action by Marie Lloyd and James Root against Rawl, and is to recover 150 acres of land, called the Green Bush place, in Richland County. The plaintiffs request me to make these declarations of law in the requests to charge:

" '1. That, by the statutes of the State of South Carolina, all colored children, born prior to the act of December 21, 1865, are made the legitimate children of their colored mother, and are capable of inheriting from such mother, or grand-mother through the colored mother, just as if they were born in lawful wedlock.'

" '2. That, by the law of South Carolina, the grand-children of a deceased woman inherit the proportion of their grand-mother's estate, if she dies intestate, to which their parent would have been entitled if living.'

" '3. That, where a woman dies leaving a daughter and a son and two children of a deceased daughter, the daughter and son would each be entitled to one-third of her property and the children of the deceased daughter would be entitled to the other third; but where, subsequently, the son dies intestate, without having been married and leaving no issue, his share would be equally divided between his surviving sis-

ter, on one hand, and the children of his deceased sister, on the other hand.'

" '4. That one who pleads the statute of limitations is bound to make out, by a preponderance of the testimony, that his possession of the property was adverse to the title of the party who rightfully owned the same, and must show that the possession has continued in himself for the full statutory period.'

" '5. That defendants, pleading the statute of limitations, cannot tack possession to make out the period; that is to say, if the statutory period is twenty years, one who has taken possession and held it for seventeen or eighteen years and then dies and the land is sold and passes into the possession of another, the purchaser cannot tack his possession to that of the deceased so as to make out the statutory period.' That is to say, if the statutory period is twenty years, one who has taken possession and held it for seventeen or eighteen years and then dies and the land is sold and passes into the possession of another, the purchaser cannot tack his possession to that of the deceased person so as the two together would make out twenty years.    The sixth request has been withdrawn.

" '7. That one who brings an action to recover an entire tract of land and proves his title to only one-half of it, can recover the possession of such half.'    The action is not to recover the whole title, but to recover one-half.

" '8. That in such an action as the present, the jury, if they find the title in the plaintiff, may give such proportion of the rents and profits of the property as the interests of the plaintiffs may bear to the whole; but where the statute of limitations is pleaded as to the rents and profits, they are limited to the period of six years prior to the commencement of the action.'    That is to say, if you give rents and profits, you are limited to six years before the action commenced. The action was commenced 1st of March, 1899.

" '9. That when one or more heirs are minors at the time of the death of their ancestor, no ouster by a co-tenant can be

presumed, and the statute of limitations cannot bar their right of action until the full period of ten years after such ouster, and after the minors shall have attained the age of twenty-one years.' That is to say, if a right comes to a person against a minor, while that person is a minor, that minor cannot suffer by reason of the holding of the other party until he gets old enough to assert that right, until he gets twenty-one years of age; therefore, the statute of limitations do not run against a minor until the minor does reach twenty-one years of age.

" '10. That when a minor attained the age of twenty-one years in 1884, his action for the recovery of land could be barred only by the ten years possession after that period by one person, and if the person in possession sells the land before the lapse of full ten years, the purchaser cannot tack his possession to that of the one from whom he bought, but can only make out a bar by proving that he himself has held for ten years.

" '11. That in an action for the recovery of possession of the real estate, when the plaintiff relies upon a deed which is unqualified in its form, if the defendant wishes to show that a trust resulted in favor of some one else, he must allege it as an affirmative defense, and unless alleged, the Court cannot consider it.' That is correct.

" '12. That the answer in this case does not set up as a defense that a secret trust resulted in favor of DeKalb Myers in the deed of Bush to Jane McMillan, and the jury cannot consider such a defense.' All of these requests which I have read to you are correct. Here are several additional requests, and they are as follows:

" '13. That one who sets up a title by adverse possession cannot sustain such defense by showing that he was in possession of the land in common—that is, at the same time with the true owner. His possession must be exclusive of the true owner.' That is correct. I will charge you more specifically about that after awhile.

" '14. That it being incumbent upon the defendants, who

plead an affirmative defense of the statute of limitations, to establish the character of the possession of DeKalb Myers, upon which they rely, and there being no evidence that he was ever in possession of the property during the lifetime of Jane McMillan, except at the same time with Jane McMillan, no length of possession with her could ripen into right against her or those claiming under her.' That is correct, with the qualification I hereafter shall mention to you.

" '15. That the statute of limitations cannot commence to run against two or more owners of land while one of them is under the age of twenty-one years, and no length of possession short of ten years after the expiration of such minority, could ripen into title by adverse possession.' That is correct.

" '16. That the effect of the decree in the case of Josephine Moore against Jane Myers and others, the heirs at law of Baron DeKalb Myers, was to establish as against all persons who were parties to that cause; that neither the said DeKalb Myers, nor any person claiming under or through him and parties to that cause, had any right or title to the tract of land described therein as the Bynum place.

" '18. That if the jury believed, from the preponderance of the evidence, that Norville Barclay was the daughter of Jane McMillan, and that she was a colored woman, and that James H. Root and Marie Lloyd are the children of Norville Barclay, and that either of them was born prior to the 21st of December, 1865, they should find for the plaintiffs, or the one born before December 21, 1865, one-half of the land in dispute.' That is correct.

· "The 17th proposition I cannot charge.

"Now, gentlemen, very briefly, and just to set this matter before you as clearly as I can, free from all technical language, and free from any statement except the general rules which you can grasp. Now, as I charged the jury yesterday, a title to land is a right by which a party can hold it, and is discernible and able to be judged of upon sight as well as you can judge the form and appearance of a man, so that

when the thing is shown to those able to see it, it can be pronounced whether or not it is a good title; and in that respect chain of title to land differs from title to personal property. So, the question now is, who has the title to this land, the plaintiffs, Root and Lloyd, or the defendant, Rawl?

"Now, in the first place, upon what do the plaintiffs rest their title? The claim is, first, that a deed was made to Jane McMillan. The original deed has not been produced in evidence; but a copy has and read in your hearing. I charge you that the copy is in form and effect a deed. It is produced to transfer the legal title in the land in dispute to Jane McMillan. Now, what is the next step? Is Jane McMillan's deed? I charge you, if she has a deed, and if she had colored children, or grand-children, born before the 21st of December, 1865, then her title descended to those children, or grand-children. Then, what is the issue for you? The issue for you is, are the plaintiffs, James Root and Marie Lloyd, the colored grand-children of Jane McMillan, or more specifically, was Norville Barkley the colored child of Jane McMillan? Are these plaintiffs the colored children of Norville Barkley, born before December, 1865? If so, I charge you, then, that Jane McMillan's title descended, one-half of it, to these plaintiffs. If the questions of fact which I have submitted are true, then the plaintiffs have the legal title to one-half of the land in dispute.

"Now, what do defendants say? The defendants, by their answer, deny the claim of plaintiffs. They say not so, and that puts plaintiffs to prove their claim, and it is for you to say whether they have proved it. Then defendants set up what is called statute of limitations. Now, gentlemen, with reference to the holding of the Rawls themselves. If the Rawls held this land adversely, continuously and exclusively since for ten years before March, 1899—because this action was commenced March, 1899—and unless the Rawls have so held that land for ten years, then the statute of limitations could not apply, not made out in them. If you conclude it is not made out in them, then your next inquiry is, is

it made out in the person under whom they claim, to wit,
Baron DeKalb Myers? That is to say, did Baron DeKalb
Myers come into possession of this land; fix that first in your
mind; did he assert it, what the law calls trespass upon the
land, asserting the right to hold that land against the world.
If he never did that, then the statute never started to run; it
does not start to run until the man puts his face against the
true owner of the land, asserts exclusive, continuous, adverse
ownership against the party having legal title and against
the world. Now, the first question for you is, did Baron
DeKalb Myers ever assume that attitude? If he did assume
it, and assumed it against her who had the legal title and
held it that way for full twenty years, that would give a title
under the statute of limitations. Now, I am not allowed to
refer to the testimony which would indicate that he held it in
such fashion. All the testimony is before you. It is for
you to say from the facts proven before you, from his admis-
sions and everything else, whether or not he ever assumed
that attitude. Now, then, gentlemen, the defense further-
more claims that Norville Barkley was not the colored child
of Jane Myers, and if not the colored child, then plaintiffs
have no title. That is correct. Whether she was or not,
that's for you. They further claim plaintiffs were born
after the act of 1865. If that is so, then they have no title.
Whether that is so, is a question for you. Now, that is the
defendants' case.

"Now, the plaintiffs come back at the defendants and say
this in reply. The plaintiffs come back in reply and say if
Myers was on that land, holding possession of it along with
the person who had the legal title, then the statute of limita-
tions would never begin to run in his favor. I charge you,
gentlemen, that if a man and his wife are on land and the
legal title is in the wife, and they hold possession together,
occupy it together, if that state of facts exist, the statute
would not begin to run in favor of the husband against the
wife. In order to make out the statute, the possession must
be exclusive, it must be continuous, it must be adverse, must

be for the full statutory period. Now, I will leave it to the
jury to say whether or not these people were there together,
and whether or not they were holding it together. Now,
the plaintiffs say further, that it has been heretofore ad-
judged in the case of Moore against Myers, by a decree of
Court, that Baron DeKalb Myers had no title to this land.
I charge you that was a case in this Court, that it appears
from an inspection of the record that it was there adjudged
that the heirs at law of Baron DeKalb Myers who were par-
ties to that case never had any title to the land, but that the
title was in Gertrude Dickson. That decree binds Gertrude
Dickson and binds all the heirs at law of DeKalb Myers who
are parties to the case. It cannot bind DeKalb Myers, be-
cause he was dead and gone, but it binds his heirs at law
parties before the Court; couldn't bind the plaintiffs, Root
and Lloyd, because they were not.

"Whatever your verdict is, write it upon the back of the
summons and complaint. The form of your verdict will be
either, we find for the plaintiff one-half of the land in dis-
pute, and sign your name as foreman; or, we find for the
defendant the land in dispute, and sign your name as fore-
man.

"Mr. Lyles: The form of your verdict, your Honor said,
would be either, we find one-half of the land in dispute; we
submit they might also find certain amount of damages for
withholding.

"The Court: I charged that in your request. Take the
original summons and complaint and write your verdict on
the back."

We will now discuss these exceptions, grouping the first
and fifth for our immediate consideration. Evidently the
jury found that the plaintiffs—Root and Lloyd—were the
children of Norville Barclay, a colored woman, and that
Norville Barclay was the child of Jennie Myers, who
was also a colored woman, and also the said Norville
Barclay and Jennie Myers were slaves up to the date
of emancipation, which occurred in September, 1865. The

jury found, also, that the said plaintiffs were born in the year 1863 and in April, 1865, respectively. The undoubted father of these plaintiffs was a white man named Frank Root, and that to this white man Norville Barclay bore the relation of a kept mistress; in other words, her children by Root were begotten in concubinage. Jennie Myers, while she was the kept mistress of one Baron DeKalb Myers, who was a white man, bore to him two children, named Gertrude Myers and Theodore Myers, before the war between the States. Thus it appears that Jennie Myers while a slave bore three children, Norville Barclay, Gertrude Myers and Theodore Myers. The said Norville Barclay's father was James Barclay, a white man. It also appears that while Jennie Myers was the kept mistress of Baron DeKalb Myers, she, the said Jennie Myers, had conveyed to her by deed in the year 1867, a tract of land containing 150 acres, and the said Baron DeKalb Myers and his kept mistress, Jennie Myers, immediately went into possession of said 150 acres of land, under the deed to Jennie Myers in the year 1867, and so occupied those lands until the year 1874, when she died. It also appears that Norville Barclay died in the year 1870, some four years before her mother, Jennie Myers, died. The son of Jennie Myers by Baron DeKalb Myers died unmarried and without issue, some time before his mother. Gertrude Myers, the daughter of Jennie Myers, still lives and has intermarried with one Dickson. Baron DeKalb Myers died in the year 1893, in possession of the 150 acres of land. It is an inference from the testimony that Gertrude Dickson, *nee* Myers, has sold all her interest in these lands to one Simeon Rawl, who died testate, having appointed the defendants as his executors, who are now in possession of the land, claiming it as the estate of their testator, Simeon Rawl. Some years ago the heirs of Baron De-Kalb Myers brought an action against the widow of Myers and Gertrude Dickson, *nee* Myers, to recover this land as the property of their father, Baron DeKalb Myers, and it was decided in that case that the heirs of Baron DeKalb

Myers, deceased, had no interest in said lands, but that same were owned by Gertrude Dickson, *nee* Myers, under the deed conveying the same to her mother, Jennie Myers, in the year 1867. The plaintiffs were not made parties to that suit. So the question is as to the right of the plaintiffs as the children born in slavery before 21st December, 1865, of their mother, Norville Barclay, who was also a slave, to inherit from their grand-mother, who was also a slave, a share of this 150 acres of land now in the possession of the defendants. The appellants admit that the legislature of South Carolina did on the 21st December, 1865, pass an act designed to settle the *status* of husband and wife and their children who had been slaves up to September, 1865, and that there have been several decisions of the Supreme Court of this State construing such statute of 1865; but they claim that such statute is now repealed—having been repealed in February, 1872; and in addition they advance the doctrine that a negro child born of a slave mother by a white father prior to the 21st December, 1865, cannot claim under that statute; and furthermore, that such children born slaves cannot claim under the act of 1872, which will be hereinafter cited more carefully. The Circuit Judge held, however, that the act of 1865 was intended to legitimatize all slave children born of a slave mother, without any regard to the color or race of the father. The appeal questions the soundness of this decision of the Circuit Judge. At the outset, we confess that the argument of Andrew Crawford, Esq., as attorney for the appellants, presents an array of authorities, and, better still for his side of the question, a learned and powerful argument against the right of these plaintiffs under the circumstances of their birth, being children of a white father by a slave mother born before 21st December, 1865, to inherit these lands from their natural grandmother, Jennie Myers, deceased. Let us examine this act of 21st December, 1865. By its title it is "An act to establish and regulate the domestic relations of persons of color, and to amend the law in relation to paupers and vagrancy."

The title indicates that the object of the act is to establish and regulate the domestic relations—that is, the family relations—of persons of color.   Let it be borne in mind that the laws of our State up to the act of the legislature providing for the emancipation of our slave population, did not recognize the power of man and woman, slaves, to enter into a valid contract of marriage.   So much was this the case, that even when these people cohabited as man and wife, it was in the power of the master, of his own ·will, to disrupt this union.   New marriage relations could be established either by his command or at the will of either the slave husband or the slave wife.   Not only so, but in the case of the children, they could be separated from father and mother or either.   In other words, slavery meant the subjection of the husband and wife, parent and ·child, to the exercise of the master's power.   There was no law for marriage of these people.   As a consequence, there arose what we are pleased to call moral marriages, the sexes living in concubinage.   The consequences were that the terms husband and wife, parent and child, could not be applied to describe either the marriage relations or the relation of parent and child.   So much so, that when a white man begat an offspring through a colored slave woman, that offspring was an illegitimate child both of the white father and the colored mother.   Hence, it was obviously the duty of the law-making power of this State to establish the *status* of husband and wife, parent and child.   The act of 1865, 13 Stat., 269, proposed to do this.   So when husband and wife were living together as such, their *status* could be established.   So where the child or children were living with their slave parents, such a *status* as parents and children could be established.   But the class of cases just before recited did not embrace all children.   There were many instances where no living father existed, or, in most instances, where women slaves had borne offspring when no father could be said to be the husband of the mother of the offspring—when, in fact, possibly as the result of the insti-

tution of slavery, the mother had borne children where no
relation of husband was intended to be recognized by either
father or mother, or, it may be, where it could not legally
exist.   Take the case of a white man cohabiting with a slave
mother; it was contrary to the law for a marriage to exist
in such cases.   Hence, the legislature had to provide for
these instances also.   By the first section, the act in ques-
tion, and also in its second and third sections, provided for
the *status* of husband and wife.   By the fourth section,
which was in these words: "Every colored child heretofore
born, is declared to be the legitimate child of its mother and
also of its colored father, if he is acknowledged by such a
father," the *status* of child and parent was established
Notice how carefully and providently this fourth section is
made.   *Every colored child* heretofore born, is declared to
be the legitimate child of its mother.   So that, if the slave
mother, even before the 21st December, 1865, bore a child,
it was made by this section the legitimate child of such
mother.   Not so, however, with the child's father.   It was
left to his option to exercise the right of recognizing his off-
spring as his child.   Sec. 12 of this same act of 21st Decem-
ber, 1865, provides as follows: "The relation of parent and
child amongst persons of color is recognized, confers all
the rights and remedies, civil and criminal, and imposes all
the duties that are incident thereto by law, unless the same
are modified by this act, or some legislation connected here-
with."   Thus we see this act, not only by its fourth section,
establishes the *status* of parent and child by making legiti-
mate what was before illegitimate—that is, bastardy in the
offspring—but it goes further, and attaches to this new
*status* of parent and child between the mother, certainly, and
her offspring, both being born in slavery, all the legal rights
and remedies, civil and criminal, and imposes all the duties
that are incident thereto by law.   Among these rights of
legitimate children are the rights of property and the power
to inherit property.   It will be observed that this act con-
tains no restriction as to the children thus legitimatized, for

its language is full and general: *"Every colored child heretofore born,"* is declared to be the *legitimate child of its mother.* It may be the offspring of the mother by a slave father, or a free person of color, or it may be through a white man as its father—all are included in the terms, "Every colored child heretofore born." How can the English language be made any broader? And what is better, how ought the legislature to have provided differently? Up to this point, in the expression of our views, we are supported by the former adjudications of this Court on this subject. In the case of *Davenport* v. *Caldwell,* 10 S. C., at page 341, it is said: "Sec. 4 is by the force of its words beyond question retrospective, and by the term 'colored child,' includes those born during slavery. It would be unjust to the legislature to entertain for one moment the idea that this section only applied to those born since emancipation and to the children of those who were free prior to emancipation; and this is conclusive of the point that the term 'persons of color' is not limited to the persons specifically mentioned in the preliminary act. The fact that this section is retrospective, as already intimated, removes every legal objection that could be advanced to the retrospective application of the first section. If both sections are retrospective, as we think, the fourth section is a sweeping act, meant to cover all not specifically provided for in the first section, and thus to legitimatize a race not responsible for its past but charged with its future course. *It is meant to apply especially to those cases where there was not the pretense of marriage, and the connection was in no sense that of husband and wife"* (italics ours). In *Clement* v. *Riley,* 33 S. C., pp. 82 and 83, this Court held: "Then, as to the Clement claim, assuming, as we have concluded, that Isaac and Hannah were never married, then Isaac could marry Patty. The master found that Isaac and Patty 'were married according to plantation custom and with the sanction of their owner; Isaac lived with her as his wife until his death, and that Stephney Riley was their only child, the other children of

Patty being by previous husbands, from whom she was separated by sale and removal,' equivalent to a divorce or release *a vinculo matromonii* (*Davenport* v. *Caldwell, supra*). He held that the plaintiffs (Clements) were the half brothers and sisters of the intestate, Stephney, through their mother, Patty, and as such entitled to one moiety of his estate, the other going to his widow, Molly. The question is not entirely free from obscurity, but in the exercise of our best judgment, we concur in the findings of the master. This view is strengthened by the positive declaration of the act of 1865, 'that every colored child heretofore born is declared to be the legitimate child of its mother.' *It may be doubtful who is the father of a child, but there can be no doubt as to who is the mother that gives it birth"* (italics ours). In *Knox* v. *Moore*, 41 S. C., at page 361, this Court held : "The seeming inconsistency involved in holding that certain of Rindy's children could inherit as legitimate heirs of Thornton, although no marriage subsisted between Thornton and Rindy, their mother, will disappear when it is remembered that the legal status of such children did not arise in law from the fact of being born to Thornton and Rindy while slaves, but really such legal status was the creature of the statute. For in the 4th section of the act of 1865, it is declared : 'Every colored child hitherto born is declared to be the legitimate child of his mother and also of his colored father, *if he is acknowledged by such father.'* When Thornton Moore, therefore, acknowledged certain of the children born to him by Rindy while they were slaves to be his children, he thereby made such children his legal heirs under the statute."

In the case of *Roberson* v. *McCauley*, 61 S. C., 411, the matter under discussion was as to the power of a child of colored parents who lived in concubinage to inherit from the father, upon the ground that such father in the year 1865 recognized such offspring as his daughter. The Circuit Judge held that such colored offspring could not inherit from such colored father, even if such father did recognize

the offspring as his child. The Supreme Court sustained such judgment of the Circuit Court. The Circuit Judge was careful, however, to declare "that the act (of 1865) wisely enables children to inherit from their slave mothers, because the link that bound in this case was certain." This Court, in the following words, affirmed this holding of the Circuit Judge: "We are, therefore, of opinion that there was no error in the conclusions of either law or fact reached by the Circuit Judge." While discussing this right of a putative colored father to recognize as his colored child one born out of wedlock, as that such child might inherit from the father when he died intestate, the learned Chief Justice did use some strong language and broad and strong reasoning, which might cause serious inquiry as to its reaching the case of a colored child born before 1865 (21st December or 29th September, 1865), yet he nowhere indicates his inclination to overrule the cases already decided in favor of a colored child being made the legitimate child of its own colored mother, while she was a slave. Again, it might be suggested, though we do not deem it necessary in view of the foregoing citations of our State decisions, that when the Constitutional Convention in 1865, after the war between the States was over, established a commission to frame legislation to be submitted to the approaching legislature of the State in regard to the establishing a wise system to govern the family relations of persons lately slaves, and that such commission did report to the General Assembly of this State a plan for the establishment of such family relations among the late slaves, and after the General Assembly acted upon such report by the act of December the 21st, 1865, by which act so passed all colored children heretofore born should be the legitimate children of their colored mothers who had been slaves, it passed out of the power of any subsequent legislature to overturn the *status* of any such colored child to which the act of 1865 applied. If by that act these plaintiffs became the legitimate children of their mother, who had been a slave, it was not in the power of

any subsequent legislature to provide different conditions, if such conditions interfered with vested rights of the plaintiffs. It is true, that no one is an heir of a living person; yet if the law gives these plaintiffs the right as children to inherit property from certain of their kindred when they are made legitimate children of their mother, which same right is the same as that enjoyed by all other children of the State, any interference by a subsequent legislature would not be lawful. These exceptions must be overruled.

2. This exception relates to the statute of limitations, which was pleaded in bar to any recovery of this land by the plaintiffs. It has been held in this State that the statute of limitations may be proved under the general denial or it may be pleaded specifically. *Sutton* v. *Clark,* 59 S. C., 448-449; *Duren* v. *Kee,* 50 S. C., 444; *Cave* v. *Anderson,* 50 S. C., 293. In sustaining this plea of adverse possession for ten years, it may be shown that the title is not in the plaintiffs but in themselves, or even in a person who was not a party to the action. *Faysoux* v. *Prater,* 1 N. & McC., 296. In the case at bar, the defendants pleaded the general denial of plaintiffs' title and right of plaintiffs' possession, and also the statute of limitations. Their plea of the statute of limitations was in these words: "alleges that neither the plaintiffs nor their predecessors, ancestors or grantors, have been in possession or have had any right, title or interest in and to the premises at issue under the pretended title by virtue of which they claim to be the owners thereof for twenty years and more next preceding the commencement of said action, but that this defendant, his predecessors, ancestors and grantors, have for the same period of time been in the undisturbed peaceable, continuous and hostile possession of the same against the pretended title of said plaintiffs, those under whom they claim and all the world. And this defendant further makes answer, that he, his ancestors, predecessors and grantors, have been for the ten years next preceding the commencement of this action in the continuous, uninterrupted, hostile and adverse posses-

16—63

sion of the land in question against the pretended title of the plaintiffs, their predecessors, grantors and ancestors, as well as all other persons under whom they claim title therein. Wherefore, they pray that said complaint be dismissed." It will be observed by the language of the request made by the plaintiffs, it is confined to "case of one who *pleads* the statute of limitations and claims title in himself by adverse possession." The response of the Circuit Judge is to the *precise request* to charge, which was in writing. While the Circuit Judge in his general charge on the statute pleaded is full, yet in the charge as requested, he said it was correct to require that one who pleads the statute must show that such person has held the land for the full statutory period. Under these circumstances, the Circuit Judge committed no error. This exception is overruled, for the charge must be construed as a whole.

3. This exception relates to the charge of the presiding Judge upon the sixteenth request. All that the Judge said as to this request is embodied in the record here. It appears from the "Case" that the whole record of the case of Josephine Myers *v.* Jane Myers and others, as heirs at law of Baron DeKalb Myers, deceased, and Gertrude Dickson, *nee* Myers, as defendants, is not printed. It would be with great difficulty that this Court could accurately imagine what papers the record contained when offered in evidence to be construed by the Circuit Judge. He did construe these papers and gave his ruling thereon. In his charge to the jury on the request in question, he made the ruling complained of, and he also in his general charge gave the jury the benefit of his construction of these papers. We see no error therein. This exception is overruled.

4. We have had occasion many times to point out the injustice (always unintentional, of course,) done to the Circuit Judge in bringing to the Court's attention a fragment of the Judge's charge to the jury. It is impossible in requests to charge to embody all the issues in a case. A Judge is asked to present his views on an isolated matter,

and while the charge should be responsive to the isolated question, yet in his general charge he must see to it that the jury is not misled by his response to an individual request to charge. In the case at bar, the Circuit Judge did fully and carefully present to the jury the whole issues they were to consider. In his general charge he did not leave the jury in doubt as to their duty, he did not limit the jury to the parentage of Norville Barclay and that of her children, the plaintiffs, as to September or December, 1865, but called to the attention of the jury all the issues raised by the defendants in every way. This exception is overruled.

6. The sixth exception is not sustained by the "Case" for appeal. While it is true the Circuit Judge did use the language imputed to him in this exception, yet it was only a part of what he did say in this connection. A reference to the charge as hereinbefore set out in full will show that the Circuit Judge committed no error as here alleged. The exception is overruled.

7. We would desire to have remembered what we have said in considering the second exception along with this the seventh exception, for the defendants did plead the statute of limitations as existing in themselves. But they had the right under the general denial to show that the title was in some one else. Certainly, in their testimony the defendants caused great stress to be laid upon the possession of Baron DeKalb Myers. Page after page of their testimony is devoted to the matter of said Myers' possession and treatment as to third parties of his dominion over these lands. Certainly, the charge of the Circuit Judge must be responsive to the *case as made*. He did not charge upon the facts, as we understand the law governing such matters, for he nowhere commented upon the testimony in general or that of any particular witness. This exception is overruled.

8. When the Circuit Judge came to that branch of the case when the joint occupation of the land in dispute by Baron DeKalb Myers and Jennie Myers, the latter of whom

held the paper title from the year 1867 to Jennie's death in 1874, he in his charge was endeavoring to explain to the jury the effect of persons living pleasantly together upon lands to which one of such persons had the paper title; by way of illustration he referred to the case of a wife having title and the husband living with her. It was admitted on all hands that Jennie Myers was a colored woman and Myers was a white man. So, therefore, it was impossible for the jury to take the observations on this point made by the Circuit Judge to mean that the relation of husband and wife between Myers and Jennie was intended. We can see no harm to the defendants from the observations objected to. While these parties were not, and could not, be considered as man and wife, their relations were for many years of a very close and disreputable nature. Certainly, the evidence did not in the slightest degree impart any antagonistic relation between them. This exception is overruled.

It is the judgment of this Court, that the judgment of the Circuit Court be affirmed.

MR. CHIEF JUSTICE McIVER and MR. JUSTICE JONES *concur in the result.*