**Petition of SCHLAU.**

District Court, S. D. New York.
Oct. 10, 1941.

162

The facts are not in dispute. Petitioner was first married in 1911, in Austria. He emigrated to the United States in 1913 and was followed by his wife in 1914. As husband and wife they lived together until their separation in 1916. In 1920 petitioner and his wife were "divorced" by means of a "get" issued by a Rabbi in New York City. The parties did not understand the need for a civil divorce. They accepted and acted upon the Rabbinical instrument.

Shortly thereafter petitioner's wife remarried. He has not seen or heard of her since. In 1921 petitioner remarried. Since then he has lived with his second wife by whom he has two children.

The Government contends that since petitioner is living in an adulterous relationship he is not a person of good moral character.

No argument is required to establish that the Rabbinical divorce was devoid of civil effect. At law it was a nullity. The petitioner's first marriage has never been dissolved. He was, therefore, not free to contract another marriage. Chertok v. Chertok, 208 App.Div. 161, 203 N.Y.S. 163; Machransky v. Machransky, 31 Ohio App. 482, 166 N.E. 423; Shilman v. Shilman, 105 Misc. 461, 174 N.Y.S. 385. Nor is there any presumption of the death of the first wife which would allow the relationship with the second to ripen into a common law marriage. Bracy v. Bracy, 167 Misc. 253, 3 N.Y.S.2d 827.

The Government's argument is thus based upon a simple syllogism. One who lives in adultery is not of good moral character. Petitioner is living in adultery since the pretended divorce is void. Therefore, he is not a person of good moral character.

But it is to be noted that the statute is silent on the subject of adultery. It speaks only of moral character. According to Estrin v. United States, 2 Cir., 80 F.2d 105, we have come to regard adultery as a ground for exclusion from naturalization because it is a crime, and the commission of crime usually connotes lack of moral character. But this petitioner has not been convicted of a crime. "The crime of adultery cannot be committed without a criminal intent * * *." 2 Corpus Juris Secundum, Adultery, § 7, p. 476; State v. Audette, 81 Vt. 400, 70 A. 833, 18 L.R.A.,N.S., 527, 130 Am.St.Rep. 1061.

How likely is it that any grand jury would indict petitioner on the basis of the facts

Charles Gordon, of New York City, for Charles P. Muller, Assistant District Director of Immigration and Naturalization Service.

Max Schlau, petitioner pro se.

RIFKIND, District Judge.

The Government opposes the petitioner's application for naturalization on the ground that he fails to satisfy that provision of the Naturalization Law which prescribes that during the five year period immediately preceding the filing of the petition he shall have "behaved as a person of good moral character". 8 U.S.C.A. § 382.

herein recited? Assuming the improbability that an indictment were found, how likely is it that a petty jury would convict him?

Twenty years ago, ignorant of American law, this immigrant and his immigrant wife went through a procedure for the dissolution of their marriage in accordance with practices and customs which prevailed in their native land. The procedure which they utilized is one hallowed by ancient usage among Jews for over two thousand years. It has the sanction of deeply rooted moral and religious traditions. In addition to its effectiveness in conscience, the "get" has enjoyed a status of civil effectiveness in many countries and over many centuries. The Jewish Encyclopedia, title "Get"; Louis Finkelstein, Jewish Self Government in the Middle Ages. Shall we say that one who does an act here which is both lawful and moral in his native land is possessed of a *wicked character* simply because the act is here unlawful? Granted that the pretended divorce cannot have legal effect on the disposition of inheritances and on other property rights, does it necessarily follow that his pretended remarriage stamps his character as depraved?

The marriage institution is one which the state necessarily takes a very special interest in preserving. Behind the New York law of marriage, divorce, and adultery there are many civil and penal sanctions. It is not suggested that any of these be weakened. However, I find no compulsion in the law which constrains me to find the petitioner immoral simply because his conduct is unlawful.

The distinction between offenses which involve moral turpitude and those which are free of that taint is well recognized at law. That indicates that depravity of character and violation of law are not necessarily wedded together. The ancient differentiation between malum prohibitum and malum in se is a manifestation of the same common sense separation between offenses which spring from wickedness of character and those which do not.

The pre-Civil War institution of moral marriage which was recognized among the slaves, Watson v. Ellerbe, 77 S.C. 232, 57 S.E. 855, and Lloyd v. Rawl, 63 S.C. 219, 41 S.E. 312, is some evidence of the changing standards of morals within the United States and within the relatively recent past. Surely, in testing the *character* of persons from foreign lands, brought up under different local customs, we are not obliged to apply the same standards that we would necessarily employ in determining the *legality* of their acts committed here.

Under all the circumstances* I am of the opinion that petitioner has not been shown to lack the moral qualifications for citizenship, United States v. Rubia, 5 Cir., 110 F.2d 92, and his petition is, therefore, granted.

---

*It appears that in 1920, in connection with his application for a marriage license, petitioner misstated a material fact. That event occurred long beyond the statutory period. It has, therefore, been given no effect.