**Petition of R——.**

**No. 1500–P–268943.**

District Court, D. Massachusetts.

Sept. 1, 1944.

No appearance for petitioner.

James P. O'Sullivan, of Boston, Mass., for Immigration and Naturalization Service, Boston, Mass.

WYZANSKI, District Judge.

The issue before me is whether Florence R—— "has been and still is a person of good moral character" within the meaning of § 307(a) (3) of the Nationality Act of 1940, 54 Stat. 1137, 1142, 8 U.S.C.A. § 707 (a) (3), so that she may be naturalized as a citizen of the United States.

Florence R—— was born under the name of S—— F—— S—— in Esthonia. In 1928 she immigrated to the United States; and on June 15, 1941, she went through a marriage ceremony in Connecticut with Harry R——, a naturalized citizen domiciled in Massachusetts. Together they then established and have since maintained a matrimonial domicil in this Commonwealth.

Many years ago Harry R—— had married another woman. These two persons, at some time prior to June 15, 1941, while domiciled in Massachusetts, and without going to Mexico, had been awarded a decree by a Mexican tribunal. This divorce was invalid because Massachusetts does not recognize the right of a foreign country to exercise through its courts jurisdiction to dissolve a marriage when both spouses are domiciled in Massachusetts. Bergeron v. Bergeron, 287 Mass. 524, 527–529, 192 N.E. 86; American Law

Institute, Restatement, Conflict of Laws § 111.

There is no evidence that either Harry R—— or Florence R—— knew that the divorce proceedings were invalid until in the spring of this year the officials of the Immigration and Naturalization Service informed Florence R——. After receiving this information Florence R—— continued to live in the same home with Harry R——, and I suppose that, in the absence of direct evidence and as an inference from the circumstances under which they lived and from their ages, I must presume that they engaged in acts of sexual intercourse.

█ Under the law of Massachusetts those acts of Florence R—— were criminal. This Commonwealth regards it as fornication[1] if a woman has sexual intercourse with a man to whom she is not married. Mass. G.L. (Ter.Ed.) c. 272 § 18; c. 277 § 39. This is so even though she has gone through a marriage ceremony with that man in good faith, sincerely but erroneously believing that the man was validly di-

vorced. See Jekshewitz v. Groswald, 265 Mass. 413, 418, 164 N.E. 609, 62 A.L.R. 525. Compare Commonwealth v. Thompson, 11 Allen, Mass., 23, 87 Am.Dec. 685; Commonwealth v. Hayden, 163 Mass. 453, 457, 40 N.E. 846, 28 L.R.A. 318, 47 Am.St. Rep. 468; Commonwealth v. Mixer, 207 Mass. 141, 142, 93 N.E. 249, 31 L.R.A., N.S., 467, 20 Ann., Cas. 1152; McGrath v. Sullivan, 303 Mass. 327, 331, 21 N.E.2d 533. By reiteration, the local courts have emphasized their doctrine that purity of motive, and ignorance of the facts or the law are of no consequence.[2]

I, therefore, am squarely faced with the necessity of deciding whether under the Nationality Act a woman lacks "good moral character" if she has committed the crime of fornication by having sexual intercourse with a man with whom she went through a marriage ceremony in good faith, sincerely but erroneously believing the man was divorced.

A somewhat similar issue has been before the courts previously.[3] The earlier

---

[1] Massachusetts does not regard the petitioner's conduct as adultery or bigamy. Mass.G.L.(Ter.Ed.) c. 272, §§ 14, 15; c. 277, § 39.

[2] In this respect the case at bar differs from Petition of Schlau, D.C.S.D.N.Y. 1941, 41 F.Supp. 161; In re Schlau, 2 Cir., 1943, 136 F.2d 480, 481. The judges who heard that case held that (1) as a matter of fact the parties were not shown to have engaged in sexual intercourse after they had knowledge that the divorce was invalid, and (2) as a matter of law in New York the parties could not be guilty of adultery unless they had that knowledge when they engaged in sexual intercourse. I admire the certainty with which those courts concluded that as a matter of fact the parties did not have sexual intercourse after the Immigration and Naturalization Service informed them that the divorce was invalid. But even if I were prepared to adopt this view of the facts in the case at bar it would be of no avail for, as shown in the body of the opinion, ignorance of the facts is not relevant in a Massachusetts prosecution for adultery or fornication, though the rule may be otherwise in New York. Compare State v. Audette, 81 Vt. 400, 70 A. 833, 18 L.R.A.,N.S., 527, 130 Am.St.Rep. 1061; Edwin R. Keedy, Insanity and Criminal Responsibility, 30 Harv.L.Rev. 535, 544 note 33. The case of United States v. Rubia, 5 Cir., 1940, 110 F.2d 92, 93, is dis-

tinguishable on the same ground as Schlau's case, for Judge Hutcheson took the view that if a man has sexual relations in Florida with a woman who is married to another, he is not guilty of adultery if he is "in ignorance of * * * their being lawfully joined as man and wife." The correctness of that ruling turns on whether Florida rejects Mr. Justice Holmes' view that "if a man will have connection with a woman to whom he is not married, he must take the chance of her turning out to be married to some one else." Commonwealth v. Smith, 166 Mass. 370, 376, 44 N.E. 503, 504.

[3] In addition to the cases cited in the second footnote and the authorities ably reviewed in the Department of Justice, Immigration and Naturalization Service Monthly Review, Nov. 1943, Vol. 1 No. 5 pp. 11–14, the following are the principal cases. Estrin v. United States, 2 Cir., 1935, 80 F.2d 105, ruled that where the petitioner "on one occasion * * * committed an act of adultery" he should be denied citizenship because "adultery is a crime under the penal law of New York" and "is offensive to the generally accepted moral standards of the community." That case, whether or not correctly decided, involved an act not done under the color of marriage. In Petition of Lieberman, D.C.E.D.N.Y. 1943, 50 F.Supp. 121, the petitioner while domiciled in New York had gone through two marriage ceremonies with

authorities tended to take a mechanical view of the question. Their approach was that if the petitioner had engaged in sexual acts which were unlawful under the criminal code, then the petitioner was not of good moral character. Later cases, notably Petition of Schlau, D.C.S.D.N.Y. 1941, 41 F.Supp. 161; In re Schlau, 2 Cir., 1943, 136 F.2d 480, while they are distinguishable, show a tendency to investigate the particular conduct and to measure it less by statutory and judge-made rules than by the usages of the society in which the petitioner moves.

■ Ordinarily if Congress leaves a case to a judge to decide, it expects him to appraise the facts by technical criteria. He has not the freedom which a jury so often exercises to disregard the letter of the law and apply the sentiment of the community. But there are exceptional cases in which the judge enjoys a broader scope. By using in the Nationality Act a phrase so popular as "good moral character" Congress seems to have invited the judges to concern themselves not only with the technicalities of the criminal law, but also with the norms of society and the way average men of good will act, in short, with what Eugen Ehrlich in Fundamental Principles of the Sociology of Law (translated by W. L. Moll, Harvard University Press, 1936), p. 501, calls "the ascertainment of the living law." Cf. Note, 43 Harvard Law Review 117.

■ In the light of the living law I cannot say that Florence R—— has done anything which the community regards as reprehensible. She herself has been married only once and has never procured any divorce. She and Harry R—— live together in the same way as any lawfully married couple. Undoubtedly they are received among their friends and acquaintances as though their marriage were valid.

Moreover, the husband's prior divorce would seem normal to many laymen. They would see no moral difference between a person in moderate circumstances who had secured a divorce from Mexico by mail and a more affluent person who had secured a divorce in person in Nevada after establishing a domicil there. To laymen any distinction would rest on "purely abstract legal reason." It would represent a rule which, while in theory maintaining equality, in practice established a different standard for the poor and the rich. Compare the caustic remarks of Mr. Justice Maule quoted by Roscoe Pound, The Spirit of the Common Law (Boston 1921) pp. 210-212. It would disregard the fact that in our society Mexican and Nevada divorces both pass as being more or less respectable and represent the mores of the day. Compare Ehrlich, Fundamental Principles of the Sociology of the Law, supra, p. 491.

I therefore conclude that proof that a petitioner has committed fornication at least in the circumstances of this case is not an adequate ground for saying that the petitioner is not "of good moral character." I do not find it necessary to decide whether it would be a ground for denying citizenship if a petitioner had committed fornication for commercial motives, or with a minor, or under circumstances different from those here involved.

Petition for citizenship granted.

---

her uncle, one in New York and the other in Rhode Island. In New York neither marriage was valid and the parties were guilty of incest. Nonetheless Judge Galston held the woman of good moral character for purposes of naturalization. Petition of Haverly, 180 Misc. 16, 42 N.Y.S.2d 217, has a dictum that where a woman secured a Mexican divorce from her first husband and married a second time she was not of bad moral character for purposes of naturalization. But in Re Spiegel, D.C.S. D.N.Y.1928, 24 F.2d 605, Judge Bondy held that where the petitioner for citizenship was a man who had been divorced from his first wife only by a rabbi and had married again, the "petitioner's second marriage was bigamous. The petitioner, therefore, cannot be regarded as having behaved as a person of good moral character."