Petitioner in pro per.

L. H. Garner, of San Francisco, Cal., for Immigration and Naturalization Service.

### Application of BARUG.

### No. 9475–M.

District Court, N. D. California, S. D.

March 9, 1948.

HARRIS, District Judge.

The Immigration and Naturalization Service, through its designated examiner, has recommended, 8 U.S.C.A. § 733(b), that the petition of Gorgonio Lagumbay Barug for citizenship be denied on the ground that he has failed to establish "good moral character" within the contemplation of 8 U.S.C.A. § 707.

Specifically, it was found that Barug "was living with a woman to whom he was not married at the time of filing his petition, and had so resided for many years prior thereto, and was precluded from establishing good moral character."

The facts, in substance: Petitioner was born in 1909 on Leyte in the Philippine

Islands. He entered the United States lawfully in 1929 and has since resided in this country. He was inducted into the United States Army in 1942 and thereafter was honorably discharged. His record with respect to law observances is beyond reproach.

On November 22, 1942, petitioner married a woman of the Caucasian race, in a ceremony performed by a minister of the gospel (Congregational) at the Grace United Church of the Mission in San Francisco. The rites were carried out in good faith in accordance with the provisions of Section 79, California Civil Code, which provides for a ceremony confirming common law marriage, without the necessity of obtaining a license.[1] Prior thereto, petitioner had been living in extra-marital relationship for a period of approximately six years.

During said period and thereafter he undertook to support, nurture and care for his wife's children by a former marriage, ·it appearing that her former husband was deceased, and for all purposes the parties held themselves out in the community as man and wife.

It appears that Barug was motivated by a desire to give the children a respected place in the community, and to avoid the opprobrium which ordinarily attaches to such relationship, existing before the marriage.

The minister who performed the ceremony assured petitioner that the proceedings and ceremony were valid despite Section 60 of the California Civil Code, which forbids marriages between persons of the Caucasian race, and other specified races, including the Malay, of which petitioner is a member.

Upon advice of an active attorney, a member of the congregation, who customarily provided the church with legal service and advice, the minister performed many comparable ceremonies. It is manifest from a reading of the statement and report submitted by the minister[2] that he acted in the utmost good faith,[3] and that petitioner and his wife, in turn, firmly believed in the sanctity and legality of the ceremony.

Thereafter, the parties treated the marriage as valid for all purposes. During petitioner's service in the United States

---

[1] Sec. 79, C.C.: "Ceremony Confirming Common-law Marriage—Certificate and Record.—When unmarried persons,. not minors, have been living together as man and wife, they may, without a license, be married by any clergyman. A certificate of such marriage must, by the clergyman, be made and delivered to the parties, and recorded upon the records of the church of which the clergyman is a representative. No other record need be made."

[2] (The minister was seriously ill at the time of the hearing and it was stipulated and ordered that his report be received)

[3] Naturalization File 245–P–94 75–M, Letter from Congregational Church, Minister Gaylord, Stamped Sep. 25, 1947. The letter and report in part follows:

"The question then was raised of my future intention and I informed Mr. Golden that although I very strongly disapproved of such laws and statutes as No. 60, believing them to be un-justly discriminatory, yet, so long as it was the law of the State, and at least until there might be some contrary ruling by the Attorney General, I would not wilfully and knowingly violate a state law and would therefore not perform any further

marriages of the kind in question. I should add, here, however, that at the time I was performing such marriages, under the impression that they were legal, I took great satisfaction in doing so; for the parties involved, in almost every case, gave every appearance of being much in love and received the ceremony in a wholly reverent way. Many of them requested marriage in the Church itself. Nonetheless, as the records of Grace United Church will show, I did not perform any more such marriages even though very earnestly and urgently requested to do so by a number of such couples thereafter.

"I then raised the question with Mr. Golden, and subsequently with several others, as .to whether, in view of the circumstances, I ought not to endeavor to reach all those whom I had supposedly married, advise them that their marriages were apparently illegal, and offer to return to them their fees. It was his opinion, as I recall it, and likewise of all the others with whom I consulted, that it was unwise to do so; that it would only cause great confusion and probably unhappiness amongst those involved."

Army there were made regular allotment payments to his wife, based on the marriage. Not until petitioner filed his application for citizenship in the instant proceeding was he advised, or made aware, of any claimed legal imperfection in the relationship. At the first hearing when, as it appears, he was informed by the examiner that the California marriage was viewed as a nullity, petitioner immediately sought to and did clarify his marital status by going to the State of Washington where he and his wife were remarried. Such marriages are recognized in said State.

The government contends that petitioner's status with respect to "good moral character" is to be determined at the time the petition is filed, and for the statutory period of five years prior thereto, 8 U.S.C.A. § 707; that the subsequent recognized valid marriage in the State of Washington is unavailing; that the ceremonies performed under the provisions of Section 79, Civil Code, State of California, are void and ineffectual, and that " * * * the relationship which was illicit in its inception was not cured by the performance of a void act of purported marriage * * * which precludes the petitioner from establishing that he is and has been a person of good moral character within the contemplation of the Naturalization Laws * * *."

This conclusion, in the light of the facts and the findings presented, must be rejected by the court. Reliance is placed primarily upon the authority of Petition of Zapatero, 9727–M. This memorandum decision is not persuasive and is clearly distinguishable on the facts.

The marriage ceremony having been declared void, the government contends that it must necessarily follow that the relationship existing between petitioner and the woman whom he believed to be his wife is immoral and illicit; that it offends the moral standards of the community; and that petitioner by reason thereof is not a person of good moral character.

The underlying error with respect to this contention is that it eliminates the essential and all-important element of "good faith" on petitioner's part.

Good faith is not an abstruse quantity and must be determined in view of the actions and conduct of petitioner, according to the standards of average men. In the case at bar petitioner believed, under the representations of the minister, who, in turn, was advised by counsel, that he had entered into a valid, sanctified marriage. That such belief was justified is convincingly borne out by the record before the court. Under the circumstances, Barug's claimed immorality, during the five year period, consisted only in unwittingly living with a woman to whom he was not lawfully wed. The relationship was continued in good faith after the purported marriage ceremony. Such a relationship does not give rise to a crime under the laws of the State of California, nor does it involve moral turpitude. The authorities arising under the Naturalization Laws draw a distinction between adulterous conduct and illicit cohabitation on this basis, as well as on other grounds. In United States v. Wexler, D.C., 8 F.2d 880, 881, the court said: "Adultery is not only recognized as immoral, but it is also made a crime by the laws of this state."

Morality is not to be measured solely by conventional formality, nor are the morals of the community static. The trend of recent Naturalization decisions is to stress stability and faithfulness in the marital relationship, rather than the mere legality of ties. Petitions of Rudder, 2 Cir., 159 F.2d 695.

The term "good moral character" in the Nationality Act is not a term of technical legal connotation. It must be viewed in the light of the standards of society and the conduct of average men of the community in which petitioner resides.

The function of this court in passing upon petitioner's application for naturalization was clearly stated in the Petition of R——, D.C., 56 F.Supp. 969, 971: "By using in the Nationality Act a phrase so popular as 'good moral character,' Congress seems to have invited the judges to concern themselves not only with the technicalities of the criminal law, but also with the norms of society and the way average men

of good will act * * *." The recent trend of decisions indicates that courts have granted petitions for naturalization despite marital imperfections and irregularities where the facts have demonstrated that petitioners acted in good faith, although under erroneous advice or misconception of the law.[4]

Under the circumstances and after a review of all of the files, records and proceedings before the examiner, including the several hearings before this court, it is found: That the petitioner has acted in good faith and is a person of good moral character within the contemplation and meaning of the Naturalization Laws.

Accordingly, it is hereby ordered and decreed that the petition for naturalization be and the same is hereby granted upon petitioner's taking the oath of citizenship.

---

[4] See Petition of Lieberman, D.C., 50 F.Supp. 121; Petition of Haverly, 180 Misc. 16, 42 N.Y.S.2d 217; In re Schlau, 2 Cir., 136 F.2d 480; Petition of De-Komlossy,[1] Immigration No. 73865, 1947,

[1] No opinion for publication. D.C.N.D.Cal.; United States v. Rubia, 5 Cir., 110 F.2d 92.