8424

## CHILDS v. CHILDS.

PARENT AND CHILD—SLAVES—INTESTATE'S ESTATES.—The son of a slave by a woman in concubinage, whom he acknowledged as his son after 1865, is not entitled to inherit with the woman to whom the slave was morally married as such and with whom he lived as his wife after emancipation.

Before ERNEST GARY, J., Greenwood, October, 1912. Reversed.

Action by Eliza Childs in her own right and as administratrix of Wm. Childs *et al.* against John Childs *et al.* The report of the master, W. J. Moore, is:

"This is an action for the partition of two certain tracts of land, in Greenwood county, containing together about two hundred and ten acres, of which one William Childs died seized and possessed. The said William Childs having died intestate, the question is: Who is entitled to inherit his estate?

"The plaintiffs allege in their complaint that the said William Childs left surviving him as his heirs at law and distributees, his widow, Eliza Childs, one of the plaintiffs, who is entitled to one-half interest in the fee thereof; one brother, Jesse Childs, and the children of a deceased sister, Lavenia Coleman, whose names are Julia Williams, Sam Coleman, Cornelia McGhee, Mamie Bowles, Alice Howard and Laura Stewart.

"That since the death of the said William Childs, his brother, Jesse Childs, has died, leaving surviving him as his only heirs at law and distributees, the following persons, to wit: Wiley Childs, Queen Brown, Onie Sowells and Georgeanna Pope, all of whom are brothers and sisters of the half-blood; and the following named persons, to wit: Julia Williams, Sam Coleman, Cornelia McGhee, Mamie Bowles, Alice Howard and Laura Stewart, who are children of the

deceased sister, Lavenia Coleman, all of whom are plaintiffs in this action.

"The plaintiffs claim to own the said lands as tenants in common as the only heirs at law and distributees of the said William Childs, deceased, but inasmuch as Jno. Childs, Phillip Childs, Mamie Carroll, Pierce Childs, Pink Childs, Hattie Williams and Laura Childs claimed to own some interest in said lands, they were made parties defendant.

"The defendant, Jno. Childs, in his answer alleges that he is the son of the said William Childs, deceased, and that he and his nieces and nephews, children of a deceased brother, Harper Childs, are entitled to inherit the said lands as heirs at law of his father, William Childs, deceased. He alleges, further, if the said Eliza Childs is the widow of William Childs, deceased, he and his nieces and nephews, defendants herein, are entitled to their share.

"The defendants, Phillip, Pierce and Pink Childs, Mamie Carroll and Hattie Williams, allege in their answer that they are the only surviving heirs at law of William Childs, deceased, and are entitled to inherit his property—that about the year 1853, the said William Childs, according to the manner of slaves, married a slave known as Dinah—that there was born to this marriage a son named Harper (Childs), who died intestate some four years ago, leaving as his only heirs at law his children, Phillip, Pierce and Pink Childs, Mamie Carroll and Hattie Williams.

"The defendant, Laura Childs, did not answer or demur and claims no interest in the said lands.

"After the commencement of this action, Eliza Childs, one of the plaintiffs and to whom letters of administration on the personal estate of William Childs, deceased, had been granted, died. At the beginning of the references in this case, it was agreed by counsel that the proper parties be substituted in her stead. The following were substituted in her stead: Marshall Matthews and Abram Strom, grantees of Eliza Childs.

"As was stated in the outset of this report the question is, who is entitled to inherit the estate of William Childs, deceased, as his heirs at law?

"Old Bill (William Childs) was a slave, and Eliza and Dinah, his reputed wives, were slaves till the proclamation of emancipation set them free. All belonged to the Holloway family, and all of whom are now dead. Bill died in December, 1909, Eliza died in December, 1910, and Dinah died probably twenty or twenty-five years ago.

"This case involves the construction and effect of those statutes in this State relating to the martial relations and issues of former slaves. These statutes and the decisions of the Court relating thereto were fully discussed by counsel in their arguments before me.

"Many witnesses were examined and much testimony was taken—some of which is conflicting and contradictory, necessarily so from the long lapse of time since the transpiring of events about which the witnesses were called upon to testify.

"From a careful consideration of the testimony I find as matters of fact:

"That some ten or fifteen years before the war Bill (William Childs), who was a slave, and Eliza, who was a slave also, belonging to old Mrs. Holloway, the mother of Watt Holloway and Lewis Holloway, went together as man and wife on the Watt Holloway place. At that time Watt and his mother were living together on the Watt Holloway place. Bill and Eliza were both young at the time of going together as man and wife.

"I am satisfied from the testimony that Bill and Eliza were married according to the custom of slaves in that day and time and that they cohabited—lived as man and wife in the same house, until the death of old Mrs. Holloway, when, in the division of her property, Eliza fell to her son, Lewis Holloway, and Bill to Watt Holloway. Eliza was carried or moved to the Lewis Holloway place, but she and

Bill continued the relationship of man and wife after she was moved to the Lewis Holloway place, which was some two and a half miles distant. Bill visited her regularly once or twice a week under passes given him—generally Saturday evenings and remained with her till the Monday following. They lived as man and wife during slavery and were recognized by their owners as man and wife. After the war they moved together and lived together as man and wife till Bill died in 1909. To them no children were born.

"The testimony of the negro witnesses for the plaintiffs, supported by the unimpeachable testimony of Mrs. Mattie Pratt, who was a daughter of Watt Holloway, the testimony of Mr. W. S. Dodgens, who was an overseer on the Watt Holloway place in 1857 or 1858, the testimony of Mr. Albert Reames and Mr. Sumpter Turner, convinces me that Eliza was old Bill's lawful wife from the time they were married, away back yonder in slavery time, till the death of Bill in 1909.

"On the 21st day of December, 1865, they were living together as man and wife.

"From the testimony it appears that Dinah was a slave of Watt Holloway, and that Mr. Holloway bought Dinah and her baby child, Ab., from off the Carter place, after old Mrs. Holloway died, and brought them to his place.

"It appears from the testimony that there was born to Dinah while she was a slave on the Watt Holloway place, at least four children, a son by the name of Harp, and three daughters. Another son by name of John was born to her later.

"It is claimed by the defendants that Bill and Dinah were married according to the custom or manner of slaves about 1853, and that to them were born two sons, Harp and John. Harp died about four or five years ago, leaving surviving him, as his heirs at law, his sons, Phillip, Pierce and Pink Childs, and his daughters, Mamie Carroll and Hattie Williams, who, along with their uncle, John Childs, claims to

own or are entitled to inherit as heirs at law, the property left by William Childs.

"I am satisfied from the testimony, and I find as matters of fact that old Bill (William Childs) was the father of Harp and John, and that he recognized them as his children. They lived with him or on his lands at various times. The question then is, being the sons of old Bill and recognized as such, are they entitled to inherit?

"The testimony does not satisfy me that there ever was an actual or moral marriage between Dinah and old Bill (William Childs). On the contrary, it shows, in my opinion, that the relationship between Dinah and old Bill was merely that of concubinage, of which Harp and John are unfortunately the fruit. Dinah came on the Watt Holloway place with one child, Ab. Harp was her next child born. Then came the three girls, Sarah, Lavenia and Susie, and next John, who was probably born after freedom.

"It is not claimed that the girls were Bill's children.

"In consequence of the facts as above found, I hold as a matter of law:

"That Harp's heirs and John, who are defendants herein, are not entitled to inherit the said lands of the said William Childs, deceased, under any of the various statutes enacted on slave marriage, etc., as construed in *Knox* v. *Moore,* 41 S. C. 355; *Robertson* v. *McCauley,* 61 S. C. 411; *Watson* v. *Ellerbe,* 77 S. C. 232, and in other cases.

"As a matter of law the plaintiffs herein and not the defendants are entitled to inherit the said lands of William Childs, deceased.

"The interest of Marshall Matthews and Abram Strom, in the said lands, is an undivided one-fourth ($\frac{1}{4}$) interest each in the fee.

"The interest of Sam Coleman, Cornelia McGhee, Julia Williams, Laura Stewart, Mamie Bowles, Alice Howard, Queen Brown, Onie Sowells and Georgiana Pope, is each

an undivided one-twentieth (1-20) interest in the fee thereof."

The defendant, John Childs, excepts to this report. The Circuit decree is:

"This cause was heard by me upon defendants' exceptions to the master's report. It is an action for the partition of two tracts of land, in said county, of which William Childs, a colored man and former slave, died seized and possessed, leaving no will. An issue has been made as to who are his heirs. The question involves the effect of the statute of 1865 (13 Stat., page 269), declaring certain persons of color to be husband and wife, and legitimizing upon certain conditions colored children theretofore born.

"Was Eliza the wife of the deceased? I find that she was, and confirm the master's finding to the same effect. William and she, belonging to the same owner, lived together on the same plantation as husband and wife until through the death of their master and the consequent distribution of his estate she was transferred to a new owner and removed to his plantation some three miles distant. William continued the relation, visiting her every Saturday night, and soon after he was freed he took her to live with him, and they thereafter lived together until his death. She has died since the beginning of this action, and her heirs have been substituted for her, as parties to the action. The probate court, upon the question of appointment of an administrator, reached the conclusion that she was the wife and entitled to appointment, and upon appeal was affirmed by Judge Robert Aldrich.

"The defendants other than Laura (who defaulted in the action) claim to be the heirs of the deceased as his descendants by his wife, Dinah, who, it is alleged, had two sons by William: Harp Childs (father of five of the defendants), and John Childs, the other defendant before the Court.

"Was Dinah also the wife of William? I find that she was not, and thus confirm the finding of the master on this point. About the time that William was deprived of the society of his wife, Eliza, by her removal to the plantation of her new owner, Mr. Lewis Holloway, there came to the plantation where William lived a young slave woman, Dinah, with a mulatto baby at her breast, the pair newly purchased by Mr. Watt Holloway, William's master. William was a sort of head man, or negro 'driver,' next to the white overseer in charge of the other slaves. He comforted himself with Dinah and regarded her as his secondary wife. But after the war he chose Eliza to live with as his regular lawful wife.

"The evidence is contradictory as to whether William and Dinah ever lived together as man and wife. There is some definite evidence that they were married by a justice of the peace and were recognized by the overseer and the master as husband and wife, and lived in the same house. There is also definite evidence that they did not live in the same house, were not known as husband and wife, and that William was disciplined by his church—or the colored people stopped him from leading prayer meeting—because Harp was laid to him by Dinah. There is also evidence that at some time Dinah had a husband, Isaac, who died soon after the war, when John was under ten years old.

"Much of this evidence cannot be depended upon, but from the circumstances of Dinah's children by different men, a mulatto to start with, then a boy by William and then three girls not claimed by him and then a boy by him, John, claimed by William, though there is some evidence that by that time that she had another husband, I incline to the opinion that she was never married to William and was never definitely recognized as his wife, certainly not to the exclusion of Eliza, whom he finally took, after freedom and stayed with till his death. But his only children were by Dinah, and he acknowledged them, and (apparently after

28—93

her death) he took them to live with him and his wife, Eliza.

"Dinah was William's 'woman,' but I cannot conclude that there was a 'moral marriage' in the usual sense of that phrase. Yet among slaves there was hardly any distinction as to the morality of their relations with women. The law of the land and the controlling authority of the master permitted and encouraged child-bearing regardless of the fathers. Young women were bought for breeders, and the annual crop was expected to come. William was in authority over the other slaves, and had the favor of the master. There can be no doubt that his relation with Dinah was known and sanctioned (at the same time he was given permits to visit Eliza Saturday nights, and Eliza alone was known as his wife, according to the information that reached polite ears). But under the act of 1865 Eliza became his lawful wife; and Dinah was not at any time, even during slavery, fully recognized by him as his wife.

"Were any of Dinah's children legitimate children of William? I find that Harp was, and I overrule the master's report to this extent. William is universally recognized as the father of Dinah's second child, her first after coming to the plantation where William was. This child was Harp, the father of five of the defendants. It is clearly proven that William always recognized and acknowledged Harp as his son, and that he took Harp to live with him after slavery. When William bought land, Harp still lived with him on his place, calling him 'pa,' and Harp's children called William 'grandpa.' As far as William could, under the law, make Harp his heir by acknowledging him as his son, he did so.

"As to the reputed son, John, the facts are not so clear. Dinah had three daughters, following Harp, and all witnesses agree that these girls were not William's children, and were not claimed or acknowledged by him. Then she had her youngest child, John, whom William acknowledged as his son, and who lived with William, as did Harp, call-

ing him 'pa,' and was generally recognized as William's son. Whether or not he was born before or after the act of 1865 and is or not entitled to rank with Harp in claiming its benefits, is not clearly proven. In view of this doubt, and in deference to the master's finding, and also in view of the announcement by counsel for defendants of an agreement by their clients to eliminate John from the issue by letting him share with Harp's children, I will not disturb the master's finding against John.

"No contest was made as to the relationship of the plaintiffs, some of whom claim as the children of William's deceased brother and sister. The master finds the relationship, and it is not excepted to. Yet there is no evidence as to the marriage or other relationship of William's parents to prove the legitimacy of his birth or that of his brother or sister,—if a 'moral marriage' is necessary to legitimacy under the statute of 1865. Nor is there proof as to the 'moral marriage' of the brother or the sister. Nor is there proof as to the heirs of Eliza. All these must trace their inheritance through slaves and establish relationship dependent upon the requirements of the act of 1865.

"The statute (13 Stat., page 269), so far as relevant to this inquiry, is as follows:

" 'An act to establish and regulate the domestic relations of persons of color, and to amend the law in relation to paupers and vagrants.

" 'I. The relation of husband and wife amongst persons of color is established.

" 'II. Those who now live as such are declared to be husband and wife.

" 'III. In case of one man having two or more reputed wives, or one woman two or more reputed husbands, the man shall by the first day of April next, select one of his reputed wives, or the woman one of her reputed husbands; and the ceremony of marriage between this man or woman, and the person so selected, shall be performed.

" 'IV. Every colored child, heretofore born, is declared to be the legitimate child of his mother, and also of his colored father, if he is acknowledged by such father.

" 'V. Persons of color desirous hereafter to become husband and wife, should have the contract of marriage duly solemnized * * *.

" 'XIII. The father shall support and maintain his children under fifteen years of age, whether they be born of one of his reputed wives or of any other woman.' Approved December 21, 1865.

"It seems beyond question that this act makes every colored child previously born (whether or not at the time morally a bastard) the legitimate child of its mother, and equally the legitimate child of the colored man who acknowledged it as his child. That the idea of the necessity of a previous 'moral marriage' is precluded in this statute is shown by the words of the act that the husband may have had 'two or more reputed wives,' and that the woman may have had 'two or more reputed husbands,' which indicates that polygamy was fully recognized as among slaves, but was to be stopped now that the slaves had been freed— hence each must 'select' one of the 'reputed' consorts and a ceremony must be performed by April 1, 1866. This ceremony was afterwards dispensed with by the act of March 12, 1872 (13 Stat., page 183), 'An act legalizing certain marriages, and for other purposes therein mentioned.' It is noteworthy, too, that the legislature limited the legitimized father to 'colored,' recognizing that without this limitation white fathers of colored children might find themselves provided with colored heirs. In providing that polygamy among the late slaves must cease within a specified time and a ceremony of marriage be performed as to the selected mates, the act is careful to provide for the protection of the children born previous to the new order of things, and it protects all colored children alike by making them legitimate as far as their parentage could be ascer-

tained—as to the mother, always; as to the father (if colored) by his admission or claim.   Further, still, the act (part of the purpose of which was to 'amend the law in relation to paupers and vagrants') provided that 'the father shall support and maintain his children under fifteen years of age, whether they be born of one of his reputed wives or of any other woman.'   This surely means that he may have a child in the legal sense, by any one of his reputed wives and also by 'any other woman,' the child having been born prior to the date of the act, December 21, 1865, and being acknowledged by the father (colored).   A child might thus be his in law, though not actually his, and no child would be fatherless (and upon the public for support) if acknowledged by any colored man as his child.

"Manifestly the act was directed to remedying, as far as possible, the consequences of the loose marital relations of the slaves and of the freedmen, and of the colored people generally, up to that time, due to conditions not only congenial to the negro race, but imposed by slavery.   It was thus humane, and in the moral sense cast a mantle of charity over the past polygamous condition of the race.   The act, however, likewise aimed at preventing unclaimed colored children, deprived of masters, from becoming a charge on the public, and it, therefore, made their natural parents, in the broadest sense, their legal parents, the father responsible for their support.   It would be most illogical and perversive of the legislative intent, if the Court should give to the act its plain meaning so far as relates to the duty of the father to support his acknowledged children (whether by reputed wives or other women) all alike, and yet should deny to the words of the act the same broad meaning when humanely bestowing upon the children the title of legitimacy, all alike.

"Upon this view of the act, it matters not if Dinah's relation with William did not rise to the dignity of a 'moral marriage,' her son by him, acknowledged by him prior to

the act, was none the less his legitimate child by virtue of this act.

"In reaching this conclusion of the law, I must disregard the apparent authority of several decisions of the. Supreme Court, in which there seems to be the assumption that the act applies only to the issue of 'moral marriages.' These cases are along the line of reasoning of Justice McIver's dissenting opinion in the case of *Davenport* v. *Caldwell,* 10 S. C., page 317, instead of following the broad lines of reasoning of Justice Haskell's prevailing opinion in that first case. The majority opinion in that case, in its actual decision and also in its *dicta,* is an elaborate and able discussion of the conditions which the act was designed to remedy and proclaims the completeness of the remedy. Justice Haskell had been a member of the legislature which enacted this legislation, and he had before him and used in parts of his opinion a copy of the report of the commission which prepared and reported the bill. He had also conferred with Judge Wardlaw, of that commission. This decision was in effect a construction of the act immediately after its passage by those who drew and passed it.

"But upon the wording alone it is impossible to see how any other construction is possible.

"I feel it my duty thus to declare the force of the statute in disregard of certain decisions of the Supreme Court because the statute now being passed upon antedates the decisions referred to, and has not been brought about upon the faith of those decisions, but, as I see it, involves rights which were vested by the statute and would be denied by judicial legislation if those decisions control. In this view I feel that the law should be declared according to the plain meaning of the statute, and if it is to be narrowed and restricted by judicial interpretation the Supreme Court should pass upon the question anew with its attention directed to points which seem to have been overlooked in the decisions in question.

"In Justice McIver's dissenting opinion in the Davenport case he sought practically to destroy the act by restricting it to the cases of births occurring since emancipation—that is within a period covering only a few months before the passage of the act.   (See 10 S. C., page 351.)   He argued that the fact that a slave might have been sold from State to State, and might have acknowledged children in each such State, would cause unending confusion if the children were to be legitimized by this act.   But he specially refused such a construction of the act because it would recognize and sanction polygamy, 'which, by our law, is a crime.'   He overlooks the fact that this kind of polygamy had actually existed and was recognized not as a crime, but as an institution, brought about by the law of slavery.   The act speaks of one person of color having 'two or more reputed wives' or husbands, and history so records.   The reputation of the State or of the institution of slavery cannot be whitewashed by a judicial construction that denies the facts.   It would be more a crime to withhold by judicial construction the cure which the law has provided for the anomalous condition brought about in a Christian State by the law of African slavery.   He further contended that the act had been in effect repealed by the Constitution of 1868.

"Such decisions as *Callahan* v. *Callahan,* 36 S. C. 454, are not inconsistent with the Davenport case, but in those cases it happened that the issue were the fruit of 'moral marriages' and the discussions emphasizing the marriages led to the view that marriage of some sort was contemplated by the statute, whereas the language of the act permits of no such view.

"The act of 1866 (13 Stat., page 366), approved September 21, 1866, 'An act to declare the rights of persons lately known as slaves and as free persons of color,' it has been held, did not repeal the act of 1865; and the effort by the Revised Statutes of 1870 to repeal that act (of 1865) likewise failed, the Supreme Court holding that the act of 1865

had vested rights which could not be afterwards divested. Nevertheless, in 1872, evidently upon the view at the time that the act of 1865 had been repealed—or possibly because of the fact that it was known that negroes had not performed the marriage 'ceremony' by April 1, 1866, as required by that act, a new act, and of less wide scope, was passed (15 Stat., page 183), approved March 12, 1872, 'An act legalizing certain marriages, and for other purposes therein mentioned.' It is as follows:

Section 1. " 'Be it resolved * * * That all persons in the State of South Carolina, who previous to their actual emancipation, had undertaken and agreed to occupy the relation to each other of husband and wife, and are cohabiting as such, or in any way recognizing the relation as still existing at the time of the passage of this act, whether the rites of marriage have been celebrated or not, shall be deemed husband and wife, and be entitled to all the rights and privileges, and be subject to all duties and obligations of that relation, in like manner as if they had been duly married according to law.

Section 2. " 'And all of their children shall be deemed legitimate, whether born before or after the passage of this act; and when the parties have ceased to cohabit before the passage of this act, in consequence of the death of the woman, or from other cause, all of the children of the woman recognized by the man to be his shall be deemed legitimate: *Provided, however,* That no provision of this act shall be deemed to extend to persons who have agreed to live in concubinage after their emancipation.'

"This act, by its proviso excluding from its benefits 'persons who have agreed to live in concubinage after their emancipation,' seems to extend its benefits to persons who had agreed to live in concubinage *before their emancipation,*—or, rather, it does not distinguish the relation of cohabiting among slaves, prior to the emancipation, as either marriage or concubinage; and this is the true view and is in

accordance with the previous statutory language on the subject.

"But this act—passed seven years after freedom, and after the 'plural wives' and 'plural husbands' of slavery days had been provided for and largely removed by the act of 1865—makes no reference to 'reputed' wives, etc., but distinctly is aimed at legalizing then existent 'moral marriages.' This act is entirely different in its purpose from the act of 1865, because aimed at a different condition, a condition of the neglect of the marriage 'ceremony,' but not of legal incapacity to marry (as was the condition in slavery days) ; and yet this act has doubtless caused confusion in the minds of many as to the State legislation in reference to legitimizing colored children. The idea of 'moral marriages' was introduced and the wider scope of the act of 1865 was lost sight of. Yet this act, in the latter part of section 2, seems to be far-reaching enough to cover the case before us; it recognizes 'concubinage' *before emancipation* as coming within the terms of 'the relation to each other of husband and wife,' provided for in section 1, and further provides that 'when the parties have ceased to cohabit before the passage of this act, in consequence of the death of the woman, or from other cause' (which means, *from any cause whatever*), 'all of the children of the woman recognized by the man to be his shall be legitimate.' This would legitimize John, whose birth was not definitely enough placed to warrant a reversal of the master's findings against him, under the act of 1865 ; but he is eliminated from this case by agreement.

"This act, like the other, shows the legislative mind not to condone concubinage too long *after emancipation,* but not to recognize it, any more than legal marriage, as having existed before emancipation. In the condition of slavery, there was no moral quality to the relation between the sexes.

"Since Dinah and William had ceased to cohabit by this time, their two children acknowledged by him became legitimate under this act, regardless of the act of 1865.

"There is strong reason in the view that without any of these statutes the issue of 'moral marriages' would have been legitimized by the abolition of slavery, being 'customary marriages' and therefore common law marriages. Hence there was really no necessity for these statutes except to provide for the other and harsher cases. This view is further justified by the provision in the act of 1865 that to be legitimized the child must be 'acknowledged' by the father to be his. There would be no need of special acknowledgment in the case of the issue of a 'moral marriage;' every presumption would be already in favor of the parentage. Similarly in the act of 1872—'all of the children of the woman, *recognized by the man to be his,* shall be deemed legitimate'—requiring him to pick his children from others by the same mother, rather than invoking a presumption that all are his, before they shall be legitimate; here we have further evidence that the purpose of these statutes was to remedy as far as possible a generally recognized prevalent condition of the promiscuous illicit intercourse among slaves.

"The act of 1865 referred to is to be constructed in connection with a preceding act, approved December 19, 1865 (13 Stat., page 245) : 'An act preliminary to the legislation induced by the emancipation of slaves.'

"These acts are more far-reaching in their application to the issue than to the woman by whom the issue are born. The notorious relations of negro men and women in slavery, and the remarkable knowledge of who were the fathers of the issue emerging from these relations, had made it common for colored men of respectability to have sons and daughters of respectability with different mothers. This condition, not the fault of the children, and not truly the fault of the parents (because of the absence of legal recognition of any, even the most 'moral' (?) marriage among slaves, and because of the forcible separation of husband and wife upon the transfer of ownership, and because of the paramount duty of the woman to bear children and

increase the wealth of the master) is the evil which was upon them when they were made freedmen and citizens, with the right to own property and the need of heirs to succeed them in its possession at their deaths.

"I recognize that the Davenport case is largely made up of dicta, and that in that case the issue were of a 'moral marriage.' Yet I must approve the reasoning of that case, its humanity, and its broad purpose to accept to the fullest the legislative intent to remove the evil of slavery so far as the institution had given the former slaves a most involved natural family relation, or doubtful or negative legal status.

"I am impressed with the painstaking accuracy of the master for Greenwood county, as shown in his report in the case before me, and I concur in his findings of fact, except as hereinabove modified, and I recognize that his conclusions of law are in accord with the recent decisions on this subject, which, however, I believe have been rendered without the real issue being before the Court, as it is now presented. The master's report as herein modified is made the judgment of this Court.'"

From this decree plaintiffs appealed.

*Messrs. Featherstone & McGee* and *Giles & Ouzts,* for appellants.

*Messrs. Featherstone & McGee* cite: *Slave marriages:* 41 S. C. 355; 77 S. C. 232; 61 S. C. 411; 36 S. C. 455.

*Messrs. Giles & Ouzts* cite: *As cases settling the issues here:* 10 S. C. 317, 500; 20 S. C. 202, 522; 26 S. C. 270, 454; 33 S. C. 66; 41 S. C. 355; 61 S. C. 411; 63 S. C. 219; 77 S. C. 112; 78 S. C. 210. *Stare decisis:* 68 S. C. 55; 64 Fed. 553; 7 Conn. 149; 40 Fed. 677; 1 P. & H. 141; 98 N. Y. 396; 72 N. Y. 797; 10 St. 362.

*Messrs. Grier, Park & Nicholson,* contra, cite: *Separation by division of master's estate amounts to a divorce:* 10 S. C. 40. *The property of intestate goes to his children:* 36 S. C. 485; 33 S. C. 67; 41 S. C. 355; 61 S. C. 425. *Construction of enabling statutes:* 10 S. C. 340; 33 S. C. 83; 36 S. C. 454; 41 S. C. 355; 61 S. C. 411; 77 S. C. 232.

January 23, 1913. The opinion of the Court was delivered by

MR. JUSTICE WATTS. This is an appeal from a decree of his Honor, Judge Ernest Gary. The facts are stated in the report of the master and decree of the Circuit Judge, and should be set out in the report of the case. The Circuit Judge concurs with the master in his findings of fact, but disagrees, in part, as to the master's conclusion of law and overrules the master in part. They both find that Eliza was the only legal wife of William, the intestate, under whom both sides claim. They both find that there was never any moral marriage between Dinah and William—that their relation was that of concubinage—that the children of that relation was not the fruit of any moral marriage. The master, upon that state of facts, held that Eliza was the legal wife and the brothers and sisters of the intestate inherited the estate. The Circuit Judge holds that the son of Dinah by William is entitled to inherit along with Eliza because he was acknowledged by William to be his son prior to the act of the legislature regulating and declaring "the rights of persons lately known as slaves and as free person of color," and the acts subsequently passed in relation thereto legalizing certain marriages, etc., and was his legal child by virtue of the act of the legislature. The appellants appeal, and question the correctness of this ruling on the part of his Honor.

In order to reach this conclusion the Circuit Judge overrules a long line of decisions made by this Court wherein this Court has squarely decided the question at issue con-

trary to the view taken by his Honor, the Circuit Judge. Some of the cases are: *Callahan* v. *Callahan,* 36 S. C. 455, 15 S. E. 454; *Knox* v. *Moore,* 41 S. C. 355, 19 S. E. 683; *Roberson* v. *McCauley,* 61 S. C. 411, 3 S. E. 570; *Lloyd* v. *Rawl,* 6 S. C. 241, 41 S. E. 312; *Watson* v. *Ellerbe,* 77 S. C. 411, 57 S. E. 855; *Taggart* v. *Taggart,* 89 S. C. 490.

· Under the unbroken line of decisions of this Court since the first case arising on this question, over thirty years ago, some of the decisions are elaborate and exhaustive, the estates of former slaves have been settled and the acts of the legislature in reference to these matters have been considered by this Court from every point of view and construed by them, and the law for many years has been settled and rights have become vested and estates settled under the law as establishd by these decisions. We see no need to overrule these well considered opinions and his Honor, the Circuit Judge, was in error in so doing and his conclusions of law were erroneous. The exceptions to the Circuit Judge's decree are sustained and the judgment of the Circuit Court is modified accordingly.

Judgment modified.